# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| BILLY RAY BROOKS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.:2:12-CV-206-JEM |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Billy Ray Brooks on May 23, 2012 and Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand [DE 18], filed by Plaintiff on October 16, 2012. Plaintiff requests that the February 16, 2011, decision denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") be reversed or remanded. For the reasons set forth below, the Court denies Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits on July 16, 2009, and an application for Supplemental Security Income on July 25, 2009, alleging disability as of October 23, 2001, due to post traumatic stress disorder ("PTSD"), substance-induced mood disorder, coronary artery disease, congestive heart failure, chronic obstruction lung disease, high blood pressure, and high cholesterol. An earlier application had been denied on May 25, 2005, so that only the time period beginning on May 26, 2005, is relevant to the current claim. After his claim was denied on October 28, 2009, and again on reconsideration on January 10, 2010, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held before ALJ Roxanne J. Kelsey on January 28, 2011. Plaintiff and a Vocational Expert ("VE") testified. The ALJ issued a decision

on February 16, 2011, finding Plaintiff not disabled and denying benefits.  On February 21, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.  On May 23, 2012, Plaintiff filed suit in this Court for review of the Commissioner's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A.    Background

Plaintiff was 43 years old on May 26, 2005.  He had completed a high school education and was trained to repair vehicle air conditioning systems.  He served in the military and is a veteran of Operation Desert Storm.  He has past relevant work as a tractor trailer mechanic.

### B.    Medical Evidence

#### 1.    *Substance Abuse*

Plaintiff's record contains a long history of substance abuse.  On April 12, 2005, Plaintiff voluntarily reported to the emergency room requesting treatment for substance abuse after being given an ultimatum by his parents to get help or move out of their home.  He reported that he had been using cocaine for the previous five years and also had a long history of marijuana use.  He also reported occasional alcohol use.  Plaintiff was admitted for inpatient treatment at a Veteran's Affairs ("VA") hospital in Florida.  Plaintiff reported significant family and socioeconomic impairment secondary to drug use and stated that he had twice attempted suicide, but he said "he was not

depressed before he started using drugs." AR 735. The admitting doctor assigned a Global Assessment of Functioning ("GAF") score of 40. Upon discharge on April 18, 2005, he was given a GAF of 45.

On November 5, 2005, Plaintiff was again admitted to the emergency room after using cocaine. He reported having attempted suicide twice in the previous two weeks. He was released the same day, but he returned to the hospital on November 16, 2005 after again using cocaine. He was admitted for inpatient care and assigned a GAF of 30-40 at admission. He was discharged on November 21, 2005, with a GAF of 65. On January 3, 2006, Plaintiff was referred to a VA Substance Abuse Treatment Team for his continued cocaine use, but Plaintiff stated that his cocaine use was "not a problem" because he was only using once a week, not every day like in the past. AR 590. On June 29, 2006, Plaintiff again reported for treatment from the Substance Abuse Treatment Team program. The record notes that Plaintiff was "court ordered to do so." AR 584.

In January 2007, after serving six months in jail, Plaintiff moved back to Indiana. On December 7, 2007, Plaintiff saw VA staff psychiatrist Dr. Adam Karwetowicz for problems with anger. He reported that he quit using cocaine eighteen months earlier, but that he continued to use cannabis on the weekends. Dr. Kawetowicz assigned a GAF score of 53. Plaintiff saw Dr. Karwetowicz again in April and July 2008. He denied cocaine use, but admitted to continued use of cannabis. On November 5, 2008, Dr. Karwetowicz created a substance abuse treatment plan for Plaintiff to treat his cannabis and alcohol abuse. On January 26, 2009, Plaintiff reported to Dr. Karwetowicz that he was using cannabis "rarely" and drinking "a few beers several times a week" but that he had not used cocaine in three years. AR 851.

On May 19, 2009, Plaintiff was admitted to the emergency room after he attempted suicide. He was transferred to the VA hospital, where he was assigned a GAF of 15 at admission. He reported that he attempted to overdose on prescription medications after becoming depressed because he relapsed on crack cocaine. He reported that he had continued to use cannabis multiple times a week prior to his relapse. Plaintiff was hospitalized for ten days. Upon discharge on May 29, 2009, he was assigned a GAF of 35.

On June 8, 2009, he returned for a follow up visit with Dr. Karwetowicz. He admitted still using cannabis and alcohol. Dr. Karwetowicz advised him that cannabis and alcohol can worsen PTSD and mood symptoms and reduce the effectiveness of medications, and he recommended treatment. Plaintiff declined a referral, stating he did not believe his use to be a problem. On July 27, 2009, Plaintiff saw Dr. Karwetowicz and reported using cocaine on an almost daily basis and using cannabis several times a week. He again declined treatment.

On September 14, 2009, Plaintiff reported to Dr. Kawetowicz that he had been off of drugs and alcohol for three weeks and was "doing much better" and stated that "people had noticed he was back to his old self now that he is off drugs." AR 834. However, he continued to decline treatment and on October 19, 2009, told Dr. Karwetowicz that he was again using cocaine and "spending every penny he can get" to buy crack cocaine. AR 829. On November 9 and 30, 2009, and January 24, 2010, Plaintiff reported to Dr. Karwetowicz that he was still intermittently using cocaine. On February 8, 2010, Plaintiff reported being sober for five weeks. On April 2, 2010, Plaintiff saw psychiatrist Dr. Constance Philipps at the VA and reported being off of cocaine for three months. He stated that he continued to drink alcohol a few nights a week. She assigned a GAF of 50.

*2.     PTSD*

On June 9, 2007, Plaintiff was evaluated for PTSD related to his combat experience in Operation Desert Storm by Dr. Amin Daghestani at the VA. He reported to Dr. Daghestani that he suffered from frequent intrusive memories, recollections, nightmares, and flashbacks related to his service. The evaluation also stated that Plaintiff is jumpy, hyperanxious, hypervigilant, and wakes up at night and is unable to go back to sleep. AR 378. He denied alcohol and drug abuse at that time. Dr. Daghestani assigned a GAF of 47, "reflecting the impact of post-traumatic stress disorder on his social functioning." AR 380. A decision from the Department of Veteran's Affairs dated June 27, 2007, granted Plaintiff's application for veteran's disability benefits for service connected to PTSD with an evaluation of 30 percent, effective November 14, 2005. AR 1648.

In December 2007, Plaintiff began seeing Dr. Karwetowicz for his mental health problems, including his PTSD. He continued to address his PTSD symptoms with Dr. Karwetowicz through early 2010. At various times during his treatment, he reported anger problems, exaggerated startle responses, multiple suicide attempts, social isolation, depression, mood swings, problems sleeping, irritability, conflicts with family, and trouble interacting with others. Plaintiff was prescribed numerous medications to treat these symptoms. Some time around the beginning of 2010, Plaintiff was also enrolled in a VA telehealth program and given a "Health Buddy" instrument, which permitted him to check in electronically on a daily basis with the VA to give status updates regarding his PTSD symptoms and compliance with his medications.

*3.     Physical Impairments*

Plaintiff's record also reflects a history of heart problems, COPD, and joint pain. His heart problems date back to at least October 2001, when he had an acute myocardial infarction at a VA

Clinic in Miami, Florida. Follow-up tests revealed mildly decreased ventricular ejection fraction, that is decreased levels of blood pumped from his left ventricle. Plaintiff followed up with Dr. Hayssam Kadah at the Jesse Brown VA Clinic in Chicago, and continued to see Dr. Kadah as a primary care physician. He frequently complained of chest discomfort, and Dr. Kadah recommended that he avoid "demanding physical activities." AR 1472. On September 20, 2004, Plaintiff requested a statement from Dr. Kadah that Plaintiff is disabled. Dr. Kadah noted that Plaintiff "is not to engage in demanding physical activities although he could perform sedentary/office duties." AR 1469.

After Plaintiff returned from Florida, he returned to the care of Dr. Kadah in Chicago. On May 8, 2008, Plaintiff reported to Dr. Kadah he had been experiencing left hip pain for three weeks. Dr. Kadah noted probable left tronchanteric bursitis and referred Plaintiff for an x-ray of his left hip. Those x-rays revealed only a soft tissue calcification in the lateral aspect of the left hip, which was characterized as a "minor abnormality." AR 458. He also reported that an August 25, 2008, MRI of his hip was normal, and Plaintiff reported significant improvement in his hip after receiving an injection.

On September 24, 2008, a cardiac stress test returned abnormal findings consistent with past myocardial infarction, reversible ischemia, and a decreased ejection fraction. On April 8, 2009, Plaintiff reported to Dr. Kadah chest pain that was not related to exertion. An EKG showed no significant change since an August 2007 test. Dr. Kadah diagnosed it as "probably non-cardiac chest pain but with known [coronary artery disease]." AR 848. An April 29, 2009, cardiac stress test was mildly abnormal, so Dr. Kadah referred Plaintiff to have a cardiac catherization. On May 29, 2009,

while Plaintiff was hospitalized after his suicide attempt, Plaintiff underwent an angiogram, which revealed non-obstructive coronary artery disease.

On November 16, 2009, Plaintiff again complained of left hip pain in addition to right shoulder pain. Results of x-rays of Plaintiff's hip were normal. X-rays of Plaintiff's right shoulder showed only mild osteoarthritis. On January 21, 2010, Plaintiff returned to Dr. Kadah, reporting general "arthritic aches and pains" in his shoulders, hips, and back for which medications helped "some." AR 1528. Dr. Kadah assessed "muskuloskeletal pain" and recommended Plaintiff stop drinking and smoking. AR 1528. On April 19, 2010, Plaintiff reported pain in his shoulders, back, hips, hands, and feet as well as numbness in his right hand. Dr. Kadah assessed "chronic muskuloskeletal pain," added a medication, and ordered a wrist brace to be worn at night as well as a transcutaneous electrical nerve stimulation unit. AR 1518-19.

References to Plaintiff's COPD are scattered throughout the record but are not well documented. Plaintiff's COPD appears to date to at least November 2005 when he was prescribed an Albuterol inhaler. A December 6, 2010, pulmonary functioning test revealed decreased diffusing capacity of the lungs, suggesting the presence of emphysema. The reviewing doctor assessed a moderate obstructive defect in Plaintiff's lungs but noted there was a significant response to an inhaled broncodilator.

### 4. *Medical Opinions Regarding Functional Limitations*

On October 28, 2009, state agency psychological consultant Dr. Maura Clark completed a mental residual functional capacity assessment. AR 774-91. Dr. Clark noted Plaintiff's multiple suicide attempts and his May 2009 cocaine relapse after three years of abstinence. She indicated Plaintiff has moderate limitations in Plaintiff's ability to understand and remember detailed

instructions; in his ability to carry out very detailed instructions; in his ability to maintain attention and concentration for extended periods; and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She concluded that Plaintiff's impairment might interfere with his ability to complete tasks but not with his ability to perform simple, routine tasks. However, she also checked boxes indicating Plaintiff was "not significantly limited" in any of the other areas assessed, including his ability to maintain social functioning and wrote that Plaintiff "is able to relate well to others, sustain conversation and attend to tasks for sufficient periods of time." AR 776. Dr. Clark also wrote that Plaintiff "has a [history of] substance abuse, which is not material as [he] is able to [function] adequately even if currently using." AR 776.

On January 4, 2010, Dr. Karwetowicz completed a two-page form titled "Medical Assessment of Ability to do Work-Related Activities (Mental)." AR 1096-97. In it, he checked the box indicating that Plaintiff had no useful ability to function in the areas of following work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, maintaining attention/concentration, behaving in an emotionally stable manner, and relating predictably in social situations. He also checked boxes indicating that Plaintiff is unable to understand, remember, and carry out even simple job instructions. He also indicated that Plaintiff had a fair ability to maintain his personal appearance. To explain the basis for his assessment, Dr. Karwetowicz wrote, "Pt is service connected for chronic & severe post traumatic stress disorder. Pt indicated the above disorder makes it difficult to work

with & get along with people. Pt reported to symptoms of anger, irritability, reduced frustration tolerance, which are exacerbated in close proximity to people." AR 1097.

On August 30, 2010, medical expert Dr. Larry Kravitz reviewed Plaintiff's mental health records at the request of the Social Security Administration ("SSA"). He compiled a timeline of Plaintiff's PTSD and substance abuse and concluded that Plaintiff "would be limited to understanding, remembering and carrying out short and simple instructions, brief and superficial workplace contacts, and routine day-to-day work stressors" and that "[w]hen abstaining from drugs and alcohol, [Plaintiff] is capable of simple, routine work tasks mentally." AR 1561.

On September 23, 2010, Dr. Kadah filled out a four-page form titled "Medical Assessment of Ability to do Work-Related Activities (Physical)." AR 1616-19. He indicated that Plaintiff can lift or carry no more than ten pounds for at most up to one-third of an eight-hour workday and that Plaintiff can stand and walk for a total of an hour in an eight-hour workday and stand and walk for less than half an hour at a time. He wrote that he based these findings on Plaintiff's having coronary artery disease, congestive heart failure, and chronic obstructive lung disease. He also indicated that Plaintiff can never climb, stoop, crouch, crawl, or twist; that he can balance, kneel, and bend only up to one-third of an eight-hour day; and that Plaintiff's ability to push/pull is affected by his condition. Dr. Kadah also indicated that Plaintiff's conditions would impose limitations on his exposure to heights, moving machinery, temperature extremes, dust, fumes, humidity, and vibrations. Finally, Dr. Kadah wrote that Plaintiff "should avoid demanding physical activities" because of his "impaired cardiac and pulmonary function." AR 1618.

## C.     Plaintiff's Testimony

Plaintiff testified at his hearing that his medications for pain, PTSD, and sleeping difficulties cause him to become dizzy, lightheaded, and unfocused.  He also stated that he lies on a rubber ball for his hip pain and uses a splint on his right dominant hand to ease his wrist and thumb pain. However, he testified that his hip pain never goes away, even with the help of the medication and the rubber ball and that the pain is triggered by sitting or walking.  He further stated that he is unable to walk two blocks to his friend's house without being in pain.  He testified that he is able to walk from the parking lot at the grocery store and through a couple of aisles before he starts limping from pain and stated that he cannot stand for even thirty minutes at a time or lift more than ten pounds without experiencing chest pain. He stated he has difficulty sleeping at night due to "patrolling behavior," which he described as a need to frequently check the doors and check for noises and outside.  Plaintiff said he attempts to do minimal chores around the house and goes grocery shopping with his mother but that his mother has to go to the store by herself when his arthritis flares up. Plaintiff continued that he is able to microwave dinners for himself and his mother and do laundry and light cleaning.  When the weather is nice, he stated that he fills the bird feeders and mows the lawn using a self-propelled lawnmower.  He stated, however, that he is in significant pain after doing so.  Plaintiff also stated he has difficulty buttoning his shirts and often drops things, and he said his pain continues to get worse.  Plaintiff also testified to difficulties remembering names and numbers and appointments.  Additionally, on his "bad days," which usually account for two weeks out of a month, he says he is unable to do anything other than lay in bed.

Plaintiff indicated he had problems with drugs in his adult life, but he testified that he had been clean for thirteen months at the time of the hearing.  Finally, Plaintiff testified that he had

worked part time doing light work in November 2008 but that he missed about two days a week because of his impairments.

**D.    Vocational Expert Testimony**

The ALJ first asked the VE to inform her if any of the testimony was different from the information in the Dictionary of Occupational Titles ("DOT").  The ALJ then posed a series of hypotheticals to the VE, beginning with that of a claimant capable of light work but with the physical limitations the ALJ ultimately included in Plaintiff's RFC and concluding with a hypothetical claimant with all of Plaintiff's physical and mental limitations.  The VE testified that the hypothetical person with Plaintiff's ultimate RFC could not perform Plaintiff's past relevant work but that there were significant jobs in the national or regional economy that he could perform—namely as a laundry sorter, cleaner, or packer.  She further testified that a hypothetical person with Plaintiff's physical RFC plus a limitation of occasional use of the right dominant upper extremity for fine manipulation would still be able to perform a significant number of jobs as would someone with Plaintiff's limitations.  However, the VE testified that someone with an RFC for sedentary work and no fine finger manipulation would have no competitive employment available to him.  She also testified that someone with only occasional ability to handle on top of limits on fine manipulation would have no work available to him.  Without posing a hypothetical to the VE, the ALJ stated that if she found Plaintiff's allegations of diminished concentration and "patrolling behavior" credible, there would be no jobs available to Plaintiff.

**E.    ALJ's decision**

On February 16, 2011, the ALJ issued a decision finding Plaintiff not disabled from May 25, 2005, through the date of the decision.  She found that Plaintiff had the following severe

impairments: PTSD, depression, alcohol abuse, marijuana and cocaine abuse, coronary artery disease, hypertension, chronic obstructive pulmonary disease, osteoarthritis of the spine and bursitis of the hip. She found that Plaintiff's osteoarthritis in his right shoulder did not cause more than a minimal limitation in his ability to perform work-related activities and was therefore not severe.

The ALJ also found that Plaintiff's impairments met the requirements for the Listings for affective disorder, anxiety related disorder, and substance addition disorder. However, she found that Plaintiff would not meet or equal those or any other Listing if he stopped his substance use. Additionally, she found that Plaintiff would have the residual functional capacity ("RFC") to perform light work "except that he can only occasionally climb ramps and stairs, balance, stoop, crouch, crawl or kneel; he can never climb ladders, ropes or scaffold; and he must avoid concentrated exposure to extreme cold and extreme heat. Any work must involve only simple, repetitive tasks with no more than occasional interaction with supervisors, coworkers or the public." AR23.

Based on the foregoing RFC, the ALJ found that Plaintiff would be unable to perform his past relevant work as a mechanic. However, she found that based on Plaintiff's age, education, work experience, and RFC, there would be significant number of jobs in the regional economy that Plaintiff could perform if he stopped his substance use. Accordingly, the ALJ found that Plaintiff would not be disabled if he stopped his substance abuse and denied benefits.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will

reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must

"'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have

an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC.  The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations."  *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996); 20 C.F.R. § 404.1545(a)) (other citations omitted).  The RFC should be based on evidence in the record.  *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)).  The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision based on four arguments.  First, Plaintiff argues that the ALJ's credibility determination is erroneous.  He also argues that the ALJ improperly discounted the opinions of Drs. Karwetowicz and Kadah.  He argues that the ALJ did not properly account for the aggregate effect of his impairments, the effect of his "patrolling

behavior," or his low GAF scores in his RFC.  Finally, Plaintiff argues that the ALJ failed to ask the

VE if her testimony conflicted with the information contained in the DOT and failed to resolve

conflicts that did exist.

## A.    Credibility Determination

First, Plaintiff first argues that the ALJ's credibility determination is erroneous.  When

determining a claimant's RFC, the ALJ is to take into consideration any of the claimant's subjective

symptoms that can reasonably be accepted as consistent with the objective medical evidence and

other evidence in the record.  20 C.F.R. § 404.1529(a).  The ALJ must consider the intensity,

persistence, and limiting effects of those symptoms to determine how they affect the claimant's

functioning.   20 C.F.R. § 404.1529(c).  If objective medical evidence alone does not substantiate

a claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms,

the ALJ must make a finding on the credibility of the claimant's statements based on a consideration

of the entire case record.  20 C.F.R. § 404.1529(c).   In coming to a finding on a claimant's

credibility, the ALJ must consider the following factors:

> (i) [The claimant's] daily activities;
> (ii) The location, duration, frequency, and intensity of [] pain or other
> symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any
> medication . . . ;
> (v) Treatment . . . for relief of [] pain or other symptoms;
> (vi) Any measures . . . used to relieve your pain or other symptoms
> . . . ; and
> (vii) Other factors concerning [] functional limitations and
> restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *See also* SSR 96-7p, 1996 WL 374186, *3 (July 2, 1996).  An ALJ's

credibility determination is entitled to substantial deference by a reviewing court and will not be

overturned unless the claimant can show that the finding is "patently wrong" or "based on errors of fact or logic." *Prochaska*, 454 F.3d at 738; *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).

In making her credibility determination, the ALJ first summarized Plaintiff's alleged symptoms. She wrote, "he alleges that he gets dizzy and falls down; his leg swells and goes numb if he sits or stands for too long; and he cannot lift more than 20 pounds. The claimant also alleges that he has shortness of breath and chest pains that limit his ability to work. Further the claimant alleges that he gets so angry that he becomes violent. At the hearing the claimant alleged that he has bursitis in his shoulders and hips." AR 24. She also noted that Plaintiff testified about his "patrolling behavior" and his alleged anxiety around other people. AR 25, 26.

The ALJ accommodated some of Plaintiff's alleged symptoms in finding an RFC for less than light work, limited to simple, repetitive tasks with no more than occasional interaction with supervisors, coworkers or the public. However, the ALJ found Plaintiff's alleged symptoms not credible to the extent that he alleged greater limitations than those accounted for in that RFC. The ALJ reasoned that the alleged symptoms were not supported by objective medical evidence, that they were inconsistent with the nature and frequency of the treatment Plaintiff sought, and that they were inconsistent with "significant activities of daily living" to which Plaintiff testified or of which there was evidence elsewhere in the record. AR 26. She also frequently noted Plaintiff's non-compliance with recommended treatment, implying it undermined Plaintiff's credibility, although she never directly said so.

Plaintiff takes issue only with the ALJ's reasoning that his daily activities were inconsistent with anything more limited than an RFC for less than light work. The ALJ wrote that Plaintiff's taking care of his mother, "pushing" snow from the driveway, doing laundry, cleaning the house,

going grocery shopping once a month, having done yard work for a neighbor once, and engaging in recreational activities such as a multiple day fishing trip in 2010 were inconsistent with his alleged physical symptoms. She further found that his visiting friends and being the best man at a friend's wedding were inconsistent with the level of anxiety he alleged, and that there was no medical evidence in the record to support allegations related to his "patrolling behavior." AR 26.

Plaintiff argues that the ALJ reads to much into the cited activities, stating that they are not actually inconsistent with Plaintiff's alleged symptoms. He states that the ALJ ignores Plaintiff's testimony that he is in pain after completing many of the activities the ALJ listed, that he only goes shopping on his "good" days, that his cooking for his mother consists only of microwaving meals, and that Plaintiff has testified he is less anxious around people he knows and fellow veterans. Accordingly, he argues, the ALJ's credibility finding is based on serious errors in reasoning and must be remanded. *See Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) ("[A]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws.")

Had the ALJ relied solely on the perceived inconsistencies between the activities she cited and Plaintiff's alleged symptoms in finding Plaintiff not fully credible, Plaintiff's argument might be more persuasive. However, the ALJ also considered the consistency of Plaintiff's allegations with objective medical evidence, the nature and frequency of the treatment Plaintiff sought, and Plaintiff's non-compliance with recommended treatment. Plaintiff does not challenge the ALJ's analysis of those factors. While a more nuanced consideration of Plaintiff's daily activities would have been preferable, the Court cannot say that the credibility determination as a whole is based on "deep logical flaws" that would warrant remand.

Plaintiff also argues that the ALJ fails to take into account the side effects of his medications in making the credibility determination. However, a careful reading of Plaintiff's reasoning reveals that he actually argues that the ALJ should have accounted for the medication side effects *in his RFC*, not in determining his credibility. Plaintiff cites to a page in the record that lists the potential side effects of his fourteen different medications. He then writes that those side effects "interfere with and are likely to preclude any full-time employment" and that the ALJ should have taken them into consideration in making her credibility determination. Pl. Br. 17. However, in the context of a credibility determination, an ALJ is to consider side effects of treatment not for their effects on a claimant's ability to work, but for the support they lend an individual's allegations of intense symptoms. *See* SSR 96-7p at *8 (stating that non-compliance with medications may be justified "because the side effects are less tolerable than the symptoms"); SSR 96-7p at *7 ("Persistent attempts by the individual to obtain relief of pain or other symptoms, such as . . . trials of a variety of treatment modalities in an attempt to find one that does not have side effects . . . generally lend support to an individual's allegations of intense and persistent symptoms."). Plaintiff simply does not explain how the potential side effects of his medications make his allegations of symptoms more credible. He only argues that they interfere with his ability to work. Accordingly, his argument on this point fails.

## B.    RFC Determination

Plaintiff next argues that the RFC determination made by the ALJ is erroneous because the ALJ failed to consider the aggregate effect of Plaintiff's impairments on his functional limitations, ignored evidence in the record, and improperly gave little weight to two treating source opinions.

1. *Aggregate Effect of Impairments*

Plaintiff argues that the ALJ's RFC determination was erroneous because it fails to take into account the aggregate effect of all of Plaintiff's impairments, both severe and not severe. *See Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) ("We remind ALJs that they must not narrowly confine their review to isolated impairments when the record shows that the impairments have some 'combined effect.'"); 20 C.F.R. § 404.1523 ("[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" to find disability.). Plaintiff notes his history of substance abuse, PTSD, coronary artery disease, high blood pressure, chronic obstructive pulmonary disease, osteoarthritis of the spine, and bursitis of the hip and states, "Taken in the aggregate, Plaintiff's impairments clearly render him incapable of competitive employment." However, Plaintiff provides no real argument to support this conclusory statement and points to nothing in the decision that indicates the ALJ looked at each impairment only in isolation. Without such additional information, the Court cannot properly analyze Plaintiff's argument and therefore declines to attempt to do so. *See United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) ("'[I]t is not the obligation of this court to research and construct the legal arguments open to parties,'" and "[w]e decline to undertake that analysis on so underdeveloped of an argument.") (quoting *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)).

2.    *Ignored Evidence*

Plaintiff also argues that the ALJ improperly ignored evidence in the record relevant to Plaintiff's mental RFC. Specifically, Plaintiff argues that the ALJ ignored the effects of Plaintiff's "patrolling behavior," a symptom of his PTSD, and ignored his many low GAF scores.

Plaintiff testified at the hearing that he gets up about twice an hour throughout the night to check the doors and look outside and listen for noises. AR 59. The ALJ made no allowance for any effect of this "patrolling behavior" on Plaintiff's functioning because she did not find it credible. She reasoned that "this behavior is not documented in the claimant's medical record." AR 25. Plaintiff argues there were, in fact, many references to Plaintiff's "patrolling behavior" in the record. However, he cites to only one page in support of this assertion that one reference is contained in a daily "Health Buddy" electronic check-in with the VA. However, the record also shows that when a counselor followed up with Plaintiff, Plaintiff indicated he made the report in error and had been unable to sleep for unrelated reasons. AR 1576, 1582. Because Plaintiff offers no further argument of how the ALJ's disregarding Plaintiff's "patrolling behavior" was in error, the Court finds no reason to disturb her findings on this issue.

Plaintiff also argues the ALJ improperly ignored Plaintiff's many low GAF scores. He cites a single, unreported decision by the Seventh Circuit Court of Appeals for the broad propositions that a "GAF score of 55 suggests moderate difficulties in occupational functioning, and a score below 51 indicates a possible inability to keep a job" and that "GAF scores and recurrent bouts of depression are clearly significant lines of evidence that should [be] analyzed by the ALJ." *Bartom v. Apfel*, No. 00-1049, 2000 WL 1412777, *5 (7th Cir. Sept. 20, 2000).

The Commissioner first argues that the entirety of Plaintiff's argument is flawed because it neglects to differentiate between times when Plaintiff was abusing drugs and alcohol and times he was sober. The regulations provide: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535. Accordingly, when an claimant has a potentially disabling impairment and is also a substance abuser, the "issue for the administrative law judge is whether, were the applicant not a substance abuser, [he] would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628-29 (7th Cir. 2006) (citing 20 C.F.R. § 404.1535(b)(1); *Brueggemann v. Barnhart*, 348 F.3d 689, 694-95 (8th Cir. 2003); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001)).

As required by the regulations, the ALJ looked at whether Plaintiff would be disabled without the effects of his substance abuse. She determined he would not. In coming to this conclusion, the ALJ compared records from times that Plaintiff admitted to using drugs or alcohol to those from times he was sober. The Commissioner argues that the record shows Plaintiff's psychological symptoms increased when Plaintiff abused drugs and alcohol, resulting in correspondingly low GAF scores. Additionally, the Commissioner notes that "the record documents Plaintiff's virtually constant abuse of drugs (cocaine, cannabis) and/or alcohol" so that most of Plaintiff's GAF scores are not helpful in determining what Plaintiff's RFC would be absent the substance abuse. Plaintiff counters that one GAF score of 47 was assigned when Plaintiff had been sober for over eight months. Plaintiff also belatedly argues in his reply brief that his "mental impairments cannot be dissected from his substance abuse," making the ALJ's finding Plaintiff's

drug abuse a material factor in his disability erroneous. Pl. Reply 4 (citing *White v. Barnhart*, 235 F. Supp. 2d 820, 830 n.9 (N.D. Ill. 2002) for the proposition that "where drug addiction and 'another mental impairment cannot be separated to a reasonable degree of medical certainty . . .' drug addiction is not material"). Even if Plaintiff's argument were timely made and more thoroughly explained, a single GAF from the relevant period of Plaintiff's sobriety does not constitute a significant line of evidence such that the ALJ would have committed an error in failing to address it, especially when the whole of the ALJ's decision indicates that the ALJ did, in fact, consider the mental health limitations that the GAF scores represent even if she did not explicitly mention the scores themselves. *See Zurawski*, 245 F.3d at 888 ("[A]n ALJ may not ignore an entire line of evidence that is contrary to her findings.") (quoting *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999)).

Additionally, while courts have found in some cases that a failure by an ALJ to discuss frequent, low GAF scores was indicative of her ignoring entire lines of mental health evidence, other courts have been reluctant to ascribe such legal significance to GAF scores, reasoning that the functioning measured by GAF scores does not necessarily correlate to the specific areas of functioning an RFC is meant to reflect. *See Wind v. Barnhart*, 133 Fed. App'x 684, 692 n.5 (11th Cir. 2005) ("[T]he Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorder listings.'") (quoting 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000))); *Wilkens v. Barnhart*, 69 Fed. App'x 775, 780 (7th Cir. 2003) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."); *cf. Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)

(permitting an ALJ to discount a GAF score because it may reflect the severity of symptoms and not necessarily "reflect the clinician's opinion of functional capacity").  Accordingly, Plaintiff's generalized argument that "GAF scores . . . are clearly significant lines of evidence that should [be] analyzed by the ALJ" is an inaccurate statement of the law and ultimately unpersuasive.  Pl. Br. 22 (citing *Bartom*, 2000 WL 1412777, at \*5).

### 3.    *Weight Given Medical Opinions*

Plaintiff argues that the ALJ improperly failed to give the opinions of treating sources Drs. Karwetowicz and Kadah controlling weight, resulting in a flawed RFC. A treating physician's opinion regarding the nature and severity of a claimant's impairment must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  Being "not inconsistent" does not require that opinion be supported directly by all of the other evidence "as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." *Id.* at \*3.  To be "substantial," conflicting evidence "need only be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389 (1971)); *see also Schmidt*, 395 F.3d at 744.

If the ALJ declines to give a treating source's opinion controlling weight, she must still determine what weight to give it according to the following factors: the length, nature, and extent of the physician's treatment relationship with the claimant; whether the physician's opinions were sufficiently supported; how consistent the opinion is with the record as a whole; whether the

physician specializes in the medical conditions at issue; and other factors, such as the amount of understanding of the disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with other information in the claimant's case. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(6); *see also Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). "If the ALJ discounts the [treating] physician's opinion after considering these factors, [the Court] must allow that decision to stand so long as the ALJ 'minimally articulated' [her] reasons." *Elder,* 529 F.3d at 415 (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)); *see also Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if it . . . 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'") (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)).

The ALJ gave "little to no weight" to the opinion of Dr. Karwetowicz—provided in a form completed six months after Plaintiff's cocaine relapse and while Plaintiff still reported using cocaine—that Plaintiff had poor to no ability to perform thirteen of the fourteen mental work-related activities. The ALJ addressed Dr. Karwetowicz's opinion after a thorough review of Plaintiff's mental health records, including noting records from times Plaintiff abstained from drugs and alcohol and reported improved mental health. The ALJ accounted for some of the mental limitations noted by Dr. Karwetowicz in her RFC finding—limiting him to simple, repetitive tasks with no more than occasional interaction with supervisors, coworkers or the public—just not at the level Dr. Karwetowicz's opinion would dictate. She reasoned that level of limitation Dr. Karwetowicz noted was not supported by Plaintiff's treatment records and that "Dr. Karwetowicz does not offer any basis for [his] opinion other than a recitation of [Plaintiff's] subjective complaints." AR 27.

Plaintiff argues that the ALJ failed to give good reasons for rejecting Dr. Karwetowicz's opinion. Plaintiff points to evidence in the record that weighs toward giving Dr. Karwetowicz's opinion more weight. He argues that because Dr. Karwetowicz "work[s] for the VA, [he is an] objective, government doctor[] who [is] aware [his] opinion[] can impact the ability to get VA disability benefits, let alone Social Security, which [he does] not take lightly." Pl. Br. 19. He also points to the frequency with which Dr. Karwetowicz met Plaintiff. *See* 20 C.F.R. §§ 404.1527(c)(2)(I) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Finally, he argues that Dr. Karwetowicz's opinion is consistent with symptoms of PTSD, a diagnosis confirmed by Dr. Karwetowicz and other doctors.

However, in her summary of Plaintiff's mental health history, the ALJ pointed out enough inconsistencies between Dr. Karwetowicz's opinion and other substantial evidence in the record from times Plaintiff was sober to support her conclusion that the opinion "is not supported by the claimant's treatment records," thus justifying not giving the opinion controlling weight. Additionally, while the ALJ could have given the opinion more weight based on the factors cited by Plaintiff, her reasons were sufficient to give it less. *See* 20 C.F.R. 404.1527(c)(3), (c)(4) (providing "supportability" and "consistency" as two factors an ALJ must consider in determining the weight to give a medical opinion). While reasonable minds could disagree, it is not the job of the Court to re-weigh the evidence or substitute its judgment for that of the ALJ as Plaintiff would have the Court do. *See Boiles*, 395 F.3d at 425; *Clifford*, 227 F.3d at 869; *Butera*, 173 F.3d at 1055. Accordingly, the Court finds that the ALJ's decision to give Dr. Karwetowicz's opinion little weight is supported by substantial evidence.

The ALJ also gave "very little weight" to Dr. Kadah's opinion regarding Plaintiff's physical limitations, reasoning that Plaintiff's treatment history and daily activities do not support such extensive limitations. AR 27. The ALJ accounted for some of the restrictions to which Dr. Kadah attested in Plaintiff's RFC—limiting him to only occasional climbing ramps and stairs, balancing, stooping, crouching, crawling or kneeling and to never climbing ladders, ropes or scaffold and to always avoiding concentrated exposure to extreme cold and extreme heat—just not at the level Dr. Kadah's opinion would require. After thoroughly summarizing records related to Plaintiff's heart disease and COPD, the ALJ acknowledged that Plaintiff "has a history of cardiac disease and COPD" but found that his "treatment history does not support" the level of limitations contained in Dr. Kadah's opinion. AR 27. Additionally, she found that Plaintiff's reported daily activities are inconsistent with Dr. Kadah's proposed limitations.

Plaintiff argues that the ALJ's reasons for not giving Dr. Kadah's opinion controlling weight are inadequate. He points to evidence of Plaintiff's heart and lung diseases and again argues that because the opinion comes from a VA doctor, it must be objective. The ALJ could have given Dr. Kadah's opinion more weight based on these factors, but again, the Court will not substitute its opinion for hers. In her summary of Plaintiff's records related to his heart and lung impairments, the ALJ noted several normal or only mildly abnormal tests before concluding that Plaintiff's treatment history does not support the severe limitations recommended by Dr. Kadah. Accordingly, she has adequately articulated the substantial evidence she found inconsistent with Dr. Kadah's opinion to justify not giving it controlling weight. The lack of support in the record is also a sufficient reason to minimize the weight given the opinion. *See* 20 C.F.R. 404.1527(c)(3), (c)(4).

Plaintiff also argues the ALJ erred in determining the weight to give to the opinion of psychological consultant Dr. Maura Clark. In determining the weight to give a non-treating source's medical opinion, an ALJ must consider whether the physician's opinions were sufficiently supported; how consistent the opinion is with the record as a whole; whether the physician specializes in the medical conditions at issue; and other factors, such as the amount of understanding of the disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with other information in the claimant's case. 20 C.F.R. §§ 404.1527(c).

The ALJ gave "great weight" to most of Dr. Clark's opinion because she found it consistent with Plaintiff's medical record and his own reported symptoms. However, she gave "less weight" to Dr. Clark's opinion that Plaintiff's substance abuse was not a contributing factor material to her disability determination. She also gave less weight to Dr. Clark's opinion that Plaintiff had only mild limitations in social functioning because the ALJ fount it contrary to evidence that Plaintiff "isolates himself and has difficulty controlling his anger." AR 27.

Plaintiff argues that the ALJ erred by accepting only the parts of Dr. Clark's opinion that supported the RFC she wanted to find while rejecting those portions she did not like. It is true that an ALJ may not "simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In this case, however, the ALJ rejected Dr. Clark's opinion to Plaintiff's benefit. The ALJ included *greater* mental limitations in Plaintiff's RFC than Dr. Clark's opinion called for. Dr. Clark also stated that Plaintiff's drug use was immaterial because he was able to function adequately *even when* he was using drugs. Accordingly, Plaintiff's reasoning simply fails.

Plaintiff also argues that state agency doctors' opinions are entitled to less weight than a treating physician because state agency doctors never examine the claimant. Plaintiff is correct that a treating opinion will *generally* be given more weight than that of a non-treating opinion. *Clifford*, 227 F.3d at 870 ("[M]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."); 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not."). However, unless the treating source's opinion is well supported and not inconsistent with other substantial evidence in the record, this factor is not dispositive. The regulations provide several other factors an ALJ may consider in determining what weight to give medical opinions and they do not require an ALJ to consider any one factor more important than another. 20 C.F.R. § 404.1527(c)(2)-(6). Accordingly, the ALJ was not required, as Plaintiff suggests, to give Dr. Clark's opinion less weight than those of Plaintiff's treating physicians.

## C.     VE Testimony

Finally, Plaintiff argues that the ALJ's questioning of the VE was flawed because the hypotheticals posed to her were incomplete and because the ALJ failed to properly inquire about whether the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT").

### 1.     Hypotheticals

When an ALJ relies on testimony from a VE to make a disability determination, the ALJ must include in the hypotheticals posed to the VE all of the claimant's limitations supported by medical evidence in the record. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *see also Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539,

543 (7th Cir. 2003) ("Furthermore, to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers.") (citation omitted). Otherwise, if the VE is unaware of all of the Plaintiff's limitations, she may refer to jobs the Plaintiff cannot perform, resulting in an incorrect finding on the ultimate question of disability. *Kasarsky*, 335 F.3d at 543.

Plaintiff first argues that the ALJ failed to include in the hypotheticals posed to the VE the limitations contained in the opinions of Drs. Karwetociz and Kadah. However, the Court has already found that the ALJ reasonably concluded that these limitations were not supported by evidence in the record. Accordingly, the ALJ need not have included them in the hypotheticals.

Plaintiff also states that Plaintiff testified that he would miss about two day a week of work because of his impairments and that he was limited in his use of his right hand. The ALJ included these additional limitations in her series of hypotheticals, and the VE testified that either limitation would preclude work. Plaintiff appears to be believe that the ALJ should have included these limitations in her ultimate RFC, not just in her hypotheticals. However, he makes no actual argument on this point. Accordingly, the Court declines to consider the question.

### 2.     *Consistency of Testimony with DOT*

Finally, Plaintiff argues that the ALJ failed to resolve conflicts between the DOT and the VE's testimony. To determine whether jobs exist in the economy for a claimant's RFC at Step Five, the ALJ will look to job information available from government publications like the DOT. 20 C.F.R. § 404.1566(d). An ALJ may also use a VE to determine which occupations, if any, are compatible with a claimant's RFC. 20 C.F.R. § 404.1566(e). However, a VE may have access to information not available in the DOT, resulting in her testimony about what jobs a claimant can

perform being different from what the DOT would dictate.  SSR 00-4p, 2000 WL 1898704, at *2-3

(Dec. 4, 2000).  Therefore, if using a VE, an ALJ has an "affirmative responsibility" to ask whether

a vocational expert's testimony conflicts with the DOT and to elicit a "reasonable explanation" for

any conflict.  SSR 00-4p at *4; *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008);

*Prochaska*, 454 F.3d at 735.  If the VE responds that a conflict exists or if a conflict is apparent, an

ALJ may rely on the VE's testimony as substantial evidence to support a determination of non-

disability only if she resolves the conflict in favor of the VE's testimony and explains why.  SSR

00-4p at *4; *Overman*, 546 F.3d at 463.

In this case, the transcript reflects that the ALJ began her questioning of the VE by asking,

"(INAUDIBLE) different from the Dictionary of Occupational Titles or its supplement, will you

please tell us?" to which the VE responded, "Yes."  AR 71.  The VE did not identify any conflicts

during her testimony.  Plaintiff's first argument—that the ALJ must ask the VE if conflicts exist only

*after* she testifies about the requirements of a job—has been rejected by the Seventh Circuit Court

of Appeals.  *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) (stating that SSR 00-4p "does

not specify whether this inquiry should (or must) occur before or after a VE testifies").

Plaintiff also argues that the ALJ failed to resolve conflicts between the VE's testimony and

the DOT as required by Ruling 00-4p.  However, Plaintiff does not actually argue that the VE's

testimony conflicts with the DOT, only that the DOT descriptions themselves conflict with how the

jobs are actually performed.  For example, the ALJ included a prohibition on exposure to extreme

heat or cold in Plaintiff's RFC.  The job of a laundry sorter explicitly says there is no exposure to

extreme heat or cold, but there is exposure to humidity.  Plaintiff reasons that a laundry sorter must

necessarily be exposed to heat because the humidity would otherwise turn to frost.  Also, although

the job description of a cleaner as written in the DOT is fully compatible with Plaintiff's RFC, Plaintiff argues that "the job of a maid can be an unpredictable one, requiring varying amounts of duties above and beyond that of the description as well as depending on the state of the room and what is required." Pl. Reply 10. While it may be true that the DOT's description of these jobs are inaccurate or incomplete, nothing in the regulations or Ruling 00-4p requires that an ALJ correct the DOT.

Additionally, Plaintiff argues that the job of packer requires "constant reaching, handling, and fingering, which Plaintiff cannot perform." Pl. Br. 25. However, the ALJ did not find limitations in any of these areas. Accordingly, these requirements are simply irrelevant to the question of whether the VE's testimony conflicted with the DOT.

Plaintiff otherwise identified no actual conflicts between the DOT and the VE's testimony that would have required resolution by the ALJ. Therefore, this line of argument fails.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** the relief requested in Plaintiff's Brief [DE 16] and **AFFIRMS** the Commissioner of Social Security's final decision.

SO ORDERED this 27th day of March, 2014.

s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc: All counsel of record